CHRISTINE A. COLOGNE ET AL. *v.* WESTFARMS
ASSOCIATES ET AL.
(12059)

PETERS, HEALEY, SHEA, SPONZO and COVELLO, Js.

Argued October 14, 1983—decision released January 17, 1984

*Martin Margulies,* with whom were *Shelley Geballe* and *Martha Stone,* for the appellants-appellees (plaintiffs).

*Robert M. Dombroff,* with whom were *Melvin S. Katz,* and, on the brief, *Samuel J. Henderson* and *Joseph Aviv,* of the Michigan bar, for the appellees-appellants (named defendant et al.).

*Victor J. Dowling,* for the appellees-appellants (defendant Richard W. Sheehan et al.).

*Joseph F. Keefe,* appeared as co-counsel, for the appellee-appellant (defendant Joseph P. Vetrano).

SHEA, J. The principal question presented by this appeal is whether a court of this state may direct that the rights of free speech and petition in our state constitution may be exercised upon private property consisting of a large regional shopping center, contrary to the wishes of its owners. We conclude that it may not and vacate the judgment which contained such a decree.

The plaintiffs are the Connecticut National Organization for Women (hereinafter NOW) and one of its members, Christine A. Cologne, who are interested in promoting the rights of women through education and governmental action. The defendants are a partnership, Westfarms Associates (hereinafter Westfarms), which owns a large retail shopping center located partly in West Hartford and partly in Farmington, known as the Westfarms Mall (hereinafter Mall), the individual partners and the person[1] who operates the Mall on behalf of his employer, the Taubman Company, which has contracted to manage the property for the owners.

The Mall consists of four connected buildings which house under one roof approximately 120 retail businesses occupying 407,200 square feet of space and

---

[1] This defendant was ordered dropped as a party on October 19, 1982.

several major department stores containing about 500,000 square feet. All of these establishments are connected by common passageways. At each end of the building complex there is a courtyard area with seating accommodations designed to allow patrons of the Mall to relax while shopping. A similar "grand court" of 14,000 square feet is located approximately in the center. The passageways and courtyard areas are situated within this building and are protected from the weather. Westfarms permits and sponsors various activities to be conducted in the grand court, such as health clinics, volunteer tax assistance facilities, informational programs, exhibitions, fashion shows and concerts.

The Mall is served by several major traffic arteries, including interstate highway I-84, and it provides a parking area sufficient for 5000 cars. Several bus lines regularly provide public transportation to the Mall from surrounding communities. Approximately 5000 people patronize the Mall each day from Monday to Friday and on weekends approximately 10,000 do so. Those numbers double during the Christmas holiday shopping season. There are also 2000 people working at the Mall throughout the year, and an additional 1000 during the Christmas shopping season. There are no public streets or sidewalks within the building complex, adjacent thereto or within the parking areas.

About May 25, 1981, the plaintiffs sought permission from the company which operates the Mall to solicit persons visiting the shopping center to sign petitions in support of the equal rights amendment (ERA) to the federal constitution. The request was denied and the plaintiffs were advised that to allow such activities was contrary to the written policy of the defendants. The plaintiffs thereafter commenced a suit seeking injunctive relief for the purpose of enabling them to obtain signatures in support of ERA on the Mall premises.

On January 4, 1982, judgment was rendered, *Bieluch, J.,* for the plaintiffs requiring the defendants to provide a location in the grand court of the Mall where the plaintiffs could conduct their petitioning activities in support of ERA under specified conditions until that amendment was ratified or until July 1, 1982, the deadline established for such ratification. *Cologne* v. *Westfarms Associates,* 37 Conn. Sup. 90, 114–17, 442 A.2d 471 (1982) *(Cologne I).*

Soon after this injunction had expired in accordance with its terms, the plaintiffs brought the present action, the defendants having refused a further request to continue any solicitation activities at the Mall. In their complaint the plaintiffs sought to enjoin the defendants from preventing them from soliciting signatures on petitions and from distributing informational literature upon the common areas of Westfarms Mall without any limitation as to subject matter. On March 2, 1983, the trial court, *Spada, J.,* rendered a judgment enjoining the defendants during the period of January 1 through September 30 of each year from "prohibiting the plaintiffs' solicitation by voice, signs and descriptive materials of signatures on petitions in support of legislation pertaining to: (1) Aid to Families of Dependent Children; (2) Pay Equity Between the Sexes; (3) Sex Discrimination in Insurance Contracts; (4) Enforcement of Child Support Orders; and (5) Renewal of the Commission on Human Rights and Opportunities, at a single location in the Grand Court of the Mall to be designated by the defendants." This order was made subject to numerous conditions[2] regulating the time, place and

---

[2] The full text of the order was as follows:

"Now, therefore, it is hereby ordered that during the annual period of January 1 through September 30, the defendants shall be, and hereby are restrained and enjoined from prohibiting the plaintiffs' solicitation by voice, signs and descriptive materials of signatures on petitions in support of legislation pertaining to: (1) Aid to Families of Dependent Children; (2) Pay Equity Between the Sexes; (3) Sex Discrimination in Insurance Contracts;

manner in which the plaintiffs should conduct their activities, including a restriction confining the use of signs, descriptive materials and petitions, to the five issues specified. Both the plaintiffs and the defendants have appealed from this judgment.

(4) Enforcement of Child Support Orders; and (5) Renewal of the Commission on Human Rights and Opportunities, at a single location in the Grand Court of the Mall to be designated by the defendants, on the following terms and conditions:

"(1) The plaintiffs will conduct their activities every Saturday during normal business hours, unless such schedule interferes with Mall sponsored activities, in which event a substitute day in close proximity thereto will be offered by the defendants. Should the plaintiffs wish to suspend their activity on any Saturday or other allowed day, they will promptly notify the center manager.

"(2) The plaintiffs will supply a card table not to exceed three feet by six feet in size, no more than four chairs, and a proper receptacle for litter, but the defendants, at their option, may offer to substitute their property for any or all of such furniture.

"(3) The plaintiffs will be allowed to post two signs, not to exceed two feet by three feet in size, on or adjacent to their table announcing their presence and purpose.

"(4) The plaintiffs will be confined to the center or grand court in the immediate area of their table and chairs and to the space within ten feet of their table.

"(5) The plaintiffs will confine their activities to the authorized area and will not expand into the remaining space of the grand court, or use the walkways, entranceways, exits, parking lots or other common areas of the Mall for their permitted activities.

"(6) The plaintiffs will have no more than four persons engaged in the permitted activities within the authorized area.

"(7) The plaintiffs will maintain a normal conversational tone, and will not use any amplifying sound, recording, radio or TV equipment.

"(8) The plaintiffs will refrain from: (a) verbally inviting patrons to their table and authorized area; (b) approaching patrons outside the authorized area; (c) physically obstructing or verbally interfering with patrons; and (d) restricting in any other way the free movements of patrons and shoppers on the premises.

"(9) The plaintiffs will not be allowed to distribute membership applications, or to solicit membership applications, fees, funds, donations or contributions, but materials distributed in support of the permitted activities may contain instructions for off-premises voluntary participation in membership application and financial support of the plaintiffs' activities.

"(10) No eating or drinking by plaintiffs' personnel will be permitted at their table or within the court area or surrounding walkways.

The plaintiffs did not actually gain access to the Mall for the purpose of conducting their activities until April 23, 1983.[3] From that date until November 1, 1983, the plaintiffs have conducted their activities in the grand court of the Mall in accordance with the conditions set forth in the judgment, except for a period of two weeks. They have observed both the content restriction and the time limitation imposed by the injunction order which are the basis for their appeal from that judgment.

While the plaintiffs' initial appeal was pending, the defendants sought a dissolution of the injunction granting access to the plaintiffs. The defendants' claim there

"(11) The plaintiffs will allow no litter to be discarded in the area of the grand court other than in waste receptacles, and will periodically police and clean all litter in the walkways of the Mall resulting from materials distributed by them, and for this purpose will not be limited in the number of their personnel allowed on the premises.

"(12) The defendants will instruct their security force to protect all rights, persons and property of the plaintiffs in connection with their permitted activities.

"(13) The defendants will be allowed to post signs with noncontroversial texts, the number, size and location to be at their discretion, disavowing and disclaiming any endorsement, sponsorship or support of the plaintiffs' presence, activities, purpose and goals.

"(14) The plaintiffs' permitted activities shall be subject to such further reasonable regulations as to time, place and manner as the defendants may prescribe to assure that the plaintiffs do not interfere with the movement and rights of owners, operators, patrons, shoppers and occupants of the shopping center and to minimize any possible interference of the plaintiffs with the commercial functions of the Mall.

"(15) All authorized signs, descriptive materials and petitions shall be confined to the five content issues recited in the court's restraining order hereinabove.

"(16) Upon reasonable request, the plaintiffs shall provide to the defendants copies of descriptive materials and individual unsigned petitions in support of the permitted activities."

[3] The trial court, after a hearing on March 22, 1983, terminated any stay which may have resulted from the defendants' appeal. See Practice Book § 3065; cf. General Statutes § 52-477. Upon a motion for review of that order this court denied relief. In the interim, the trial court had found the defendants in contempt for refusal to comply with the injunction and imposed a coercive order of compliance subject to penalties.

focused on an incident occurring on Sunday morning, May 22, 1983, involving an attempt by members of the Ku Klux Klan to make an appearance at the Mall after their demand for access had been denied by the defendants.[4] On that day, the defendants, with the assistance of members of the police forces of West Hartford and Farmington, barred them from entering the Mall. After their departure, however, a number of anti-Klan demonstrators, who had been attracted by the report of the intended appearance of the Klan, engaged in a heated demonstration outside the Mall building. Police from several area towns and the state police were needed to bring the situation under control. This demonstration resulted in the closing of some of the stores in the Mall for a portion or for the remainder of that day. It is clear that none of the groups or individuals involved in the disturbance was concerned in any manner with the plaintiffs, who were not at the Mall premises at the time.

The circumstances of this disturbance were relied upon by the defendants in their motion to dissolve the injunction granting access to the plaintiffs. After an evidentiary hearing, the court, *Ripley, J.*, concluded that to allow access to the interior of the Mall building by many organizations seeking to exercise the same

---

[4] Following the decision of the trial court awarding the plaintiffs access to the Mall for the purpose of political advocacy, several other groups sought entry in order to obtain public support of their views upon such topics as abortion, anti-semitism, racism, nuclear weapons, property rights and the court system. The defendants refused these requests, but two such organizations entered the Mall and distributed leaflets without asking or receiving permission. When the defendants contacted the police to arrest or remove the persons involved as trespassers, the police refused to take such action. Prior to the announcement of the trial court's decision, however, their policy had been to arrest persons distributing leaflets at the Mall who refused to desist upon request. Both the West Hartford and Farmington police departments had obtained legal advice not to arrest such persons as trespassers because the grant of access to the plaintiffs by the trial court required that other groups be afforded similar rights.

privileges afforded to the plaintiffs by the injunction
would create a highly dangerous situation which the
police would be unable to control. Accordingly, the
injunction was modified by limiting the location where
the plaintiffs could conduct the activities permitted
under the first judgment to the exterior of the build-
ing under a portico at one of the entrances. The plain-
tiffs and the defendants have amended the appeal and
cross-appeal from the first judgment to include their
claims of error relating to the order modifying the
injunction. The plaintiffs claim that the court had no
power to modify the injunction while an appeal was
pending and that the circumstances of the disturbance,
which were wholly unrelated to their activities, did not
warrant any modification of its terms. The defendants
claim that the court should have dissolved the injunc-
tion rather than modify it.

The issues presented by this appeal have an intricate
background. In *Lloyd Corporation* v. *Tanner,* 407 U.S.
551, 92 S. Ct. 2219, 33 L. Ed. 2d 131 (1972), the
Supreme Court of the United States rejected the con-
tention that a privately owned retail shopping center
was the functional equivalent of the business district
of a municipality upon which expressive activity pro-
tected by the first amendment to the federal constitu-
tion might be conducted as freely as upon a village
green. The court found inapplicable the rationale that
where a private enterprise performs the role of a munic-
ipality it comes under the same strictures which bind
governmental agencies. See *Marsh* v. *Alabama,* 326
U.S. 501, 507–508, 66 S. Ct. 276, 90 L. Ed. 265 (1946).
The court distinguished *Amalgamated Food Employees
Union* v. *Logan Valley Plaza,* 391 U.S. 308, 318, 88
S. Ct. 1601, 20 L. Ed. 2d 603 (1968), where picketing
by a union against one of the stores in a shopping center
had been permitted, on the ground that such expres-
sive activity was related only to the dispute between

the employer and the workers involved. This distinction was later seen to constitute discrimination in the regulation of free expression on the basis of its content and *Logan Valley Plaza* was overruled. *Hudgens v. National Labor Relations Board,* 424 U.S. 507, 96 S. Ct. 1029, 47 L. Ed. 2d 196 (1976); see *Police Department of Chicago v. Mosley,* 408 U.S. 92, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972). It is clear that if the plaintiffs' asserted right to conduct their activities on the defendants' property depended entirely on federal constitutional provisions, they could not prevail. They do not claim otherwise.

The refusal to extend federal constitutional protection to expressive activity on private property left unresolved the question of whether such conduct might be protected by parallel state constitutional provisions. Federal law, whether based upon statute or constitution, establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. *Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 293, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982); *Paris Adult Theater, Inc. v. Slaton,* 413 U.S. 49, 64, 93 S. Ct. 2628, 37 L. Ed. 2d 446, reh. denied, 414 U.S. 881, 94 S. Ct. 27, 38 L. Ed. 2d 128 (1973); *State v. Ferrell,* 191 Conn. 37, 45 n.12, 463 A.2d 573 (1983); *Griswold Inn, Inc. v. State,* 183 Conn. 552, 559 n.3, 441 A.2d 16 (1981); *Fasulo v. Arafeh,* 173 Conn. 473, 475, 378 A.2d 553 (1977); *Horton v. Meskill,* 172 Conn. 615, 641–42, 376 A.2d 359 (1977). In recognition of this principle, the Supreme Court of the United States in *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980), although reaffirming its view that there was no federal basis for a right of access to a private shopping center for the purpose of expressive activity, held that the California courts were at liberty to construe that

state's constitutional guaranty of freedom of speech to require such access, and that no violation of federally protected property rights or first amendment rights of the owners had occurred.

This invitation to state courts to construe state constitutional guaranties to enhance freedom of expression above the minimum federal constitutional level in the context of access to shopping centers for political propagandizing efforts has occasioned some remarkably close divisions of opinion among the judges who have considered the matter.[5] *Robins* v. *Pruneyard Shopping Center*, 23 Cal. 3d 899, 592 P.2d 341, 153 Cal. Rptr. 854 (1979); *Batchelder* v. *Allied Stores International, Inc.*, 388 Mass. 83, 445 N.E.2d 590 (1983); *Woodland* v. *Michigan Citizens Lobby*, 128 Mich. App. 649, 341 N.W.2d 174 (1983); *State* v. *Felmet*, 302 N.C. 173, 273 S.E.2d 708 (1981); *Alderwood Associates* v. *Washington Environmental Council*, 96 Wash. 2d 230, 635 P.2d 108 (1981). Both the California and Washington decisions rely in part upon the highly significant role which initiative, referendum and recall sponsored directly by the citizenry have played in the constitutional schemes of those states, and the practical importance of access to large congregations of voters in order to obtain signatures on petitions used to implement those rights. The Massachusetts decision was expressly limited to the solicitation of signatures

---

[5] The decision of the California Supreme Court which was the subject of *Pruneyard Shopping Center* v. *Robins*, 447 U.S. 74, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980), was reached on a vote of four to three. *Robins* v. *Pruneyard Shopping Center*, 23 Cal. 3d 899, 916, 592 P.2d 341, 153 Cal. Rptr. 854 (1979). The Washington Supreme Court, in finding the constitution of that state to afford a right of access to a private shopping center for petitioning activity, was divided five to four. The Massachusetts Supreme Judicial Court was split four to three in reaching a similar result. The opposite conclusion was arrived at by the Michigan Court of Appeals, an intermediate appellate court, by a two to one division. The Supreme Court of North Carolina, however, was unanimous in finding no such right of access to exist by virtue of the constitution of that state.

needed by political candidates for access to the ballot and relied, not upon its freedom of speech provision, but upon a state constitutional guaranty of " 'an equal right to elect officers and to be elected, for public employments.' " *Batchelder* v. *Allied Stores International, Inc.,* supra, 97.

In a somewhat different context, where private universities have attempted to enforce their bans upon campus solicitation without permission, two state courts have construed their criminal trespass statutes, in the light of state constitutional free speech guaranties, to be inapplicable to the dissemination of political ideas upon the grounds of private education institutions. *Commonwealth* v. *Tate,* 495 Pa. 158, 432 A.2d 1382 (1981); *State* v. *Schmid,* 84 N.J. 535, 423 A.2d 615 (1980). The concern of the Pennsylvania Supreme Court in *Tate* was that a college which had sponsored the presentation of one speaker's views upon a subject should invoke a standardless permission requirement to prevent others from expressing opposing views upon an area of the campus normally open to the public. Similarly, in *Schmid* the New Jersey Supreme Court, in finding that electioneering activity upon a college campus could not support a conviction for criminal trespass under the state constitution, focused upon the absence of reasonable standards regulating the granting or withholding of permission to persons seeking to communicate their political viewpoints as well as upon the inconsistency of banning such communication with the general university policy of encouraging political debate.

The provisions of our Connecticut constitution upon which the plaintiffs rely are §§ 4 and 14 of article first, which is entitled "Declaration of Rights." Section 4 provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Section 14 provides: "The

citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance." A closely related provision of this article is § 5: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press." The language of these sections has remained unchanged since the adoption of our first state constitution in 1818. They appear to be almost an exact replica of corresponding sections of the Mississippi constitution which had been adopted the previous year.[6] The freedom of speech provisions of §§ 4 and 5 are quite similar to the corresponding state constitutional provisions of California, Washington, Pennsylvania, New Jersey, North Carolina and Michigan. Calif. Const., Art. I, § 2; Wash. Const., Art. I, § 5; Pa. Const., Art. I, § 7; N.J. Const., Art. I, § 6; N.C. Const., Art. I, § 14; Mich. Const., Art. I, § 5.

The history of the adoption of our Connecticut bill of rights[7] indicates that it was a response to the prevailing political sentiment of that time that the basic liberties of the people should be enshrined in a written constitution to ensure their protection from governmental infringement. See *New York Times Co.* v. *United States,* 403 U.S. 713, 715 n.1, 91 S. Ct. 2140, 29 L. Ed. 2d 822 (1971); C. Rossiter, 1787 The Grand Convention (1966) pp. 302–303; Howard, The Road from Runnymede (1968) pp. 223–24. An opposing view was expressed that such a detailed specification of individual rights was superfluous and tended to abridge them, because all governmental powers not granted by the constitution were reserved to the people. Connect-

[6] Richard Purcell, Connecticut in Transition: 1775–1818 (2d Ed. 1963) p. 240; Connecticut Journal, Sept. 1, 1818, p. 3, col. 1.

[7] See Purcell, Connecticut in Transition: 1775–1818 (2d Ed. 1963) pp. 241–42; Trumbull, Historical Notes on The Constitutions of Connecticut (1901 Ed.) pp. 55–56.

icut Journal, Sept. 8, 1818, p. 2, col. 1 (Remarks by Governor John Treadwell) (Remarks by Judge Mitchell). This debate parallels that which occurred at the time of the adoption of our federal constitution and the subsequent enactment of the first ten amendments thereto, our bill of rights. A. Hamilton, "The Federalist," No. 84.[8]

It is evident that the concern which lead to the adoption of our Connecticut Declaration of Rights, as well as the bill of rights in our federal constitution, was the protection of individual liberties against infringement by government. Tribe, American Constitutional Law (1978) p. 1147 n.1; see *United States* v. *Guest,* 383 U.S. 745, 771, 86 S. Ct. 1170, 16 L. Ed. 2d 239 (1966) (Harlan, J., concurring in part, dissenting in part); *State* v. *McKee,* 73 Conn. 18, 27–29, 46 A. 409 (1900); *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 586–89, 37 A. 1080 (1897); *State* v. *Conlon,* 65 Conn. 478, 489, 33 A. 519 (1895); see generally Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 94–97 (1982); Berdon, "Protecting Liberty and Property under the Connecticut and Federal Constitutions: The Due Process Clauses," 15 Conn. L. Rev. 41, 53–54 (1982); Purcell, Connecticut in Tran-

---

[8] In this publication Hamilton argued: "I go further, and affirm that bills of rights, in the sense and to the extent they are contended for, are not only unnecessary in the proposed Constitution, but would even be dangerous. They would contain various exceptions to powers not granted, and on this very account would afford a colorable pretext to claim more than were granted; for why declare that things shall not be done which there is no power to do? Why, for instance, should it be said that liberty of the press shall not be restrained, when no power is given by which restrictions may be imposed?" A. Hamilton, "The Federalist," No. 84.

A similar argument was advanced by Governor John Treadwell at the convention which approved the Connecticut constitution in 1818. Connecticut Journal, Sept. 8, 1818, p. 2, col. 1; see generally Purcell, Connecticut in Transition: 1775–1880 (2d Ed. 1963); Trumbull, Historical Notes on The Constitutions of Connecticut (1901 Ed.).

sition, supra. There is nothing in the history of these documents to suggest that they were intended to guard against private interference with such rights. Similarly, a review of their origin discloses no evidence of any intention to vest in those seeking to exercise such rights as free speech and petition the privilege of doing so upon property of others.

This court has never viewed constitutional language as newly descended from the firmament like fresh fallen snow upon which jurists may trace out their individual notions of public policy uninhibited by the history which attended the adoption of the particular phraseology at issue and the intentions of its authors. The faith which democratic societies repose in the written document as a shield against the arbitrary exercise of governmental power would be illusory if those vested with the responsibility for construing and applying disputed provisions were free to stray from the purposes of the originators. "If the words have a doubtful meaning, or are susceptible of two meanings, they should receive that which will effectuate the intent of the framers of the Constitution and the general intent of the instrument." *Borino* v. *Lounsbury,* 86 Conn. 622, 625, 86 A. 597 (1913).

The plaintiffs rely upon the fact that the right of free speech in § 4: "Every citizen may freely speak . . ." and of petition in § 14: "The citizens have a right . . . to apply to those invested with the powers of government . . . by petition . . ." are expressed in affirmative language creating such rights rather than as prohibitions upon the government like those contained in § 5: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press" and in the first amendment to our federal constitution: "Congress shall make no law . . . abridging the freedom of speech . . . or to petition the Government for a redress of grievances . . . ." We are not persuaded that these

variations in phraseology are sufficient to indicate an intention to allow those rights to be exercised upon every property affording a suitable opportunity for their enjoyment against the objections of the owners. Although the guaranty of equal protection in § 20 of the Connecticut Declaration of Rights is stated in absolute terms similar to §§ 4 and 14, unlike its federal counterpart, § 1 of the fourteenth amendment, which is expressly directed against state action only, this court has concluded that both these provisions "are designed as a safeguard against acts of the state and do not limit the private conduct of individuals or persons." *Lockwood* v. *Killian,* 172 Conn. 496, 501, 375 A.2d 998 (1977). There is no historical basis for reaching a different conclusion in respect to the scope of §§ 4 and 14.

The plaintiffs advance a further argument that to restrict the protection of free speech afforded by § 4 solely to instances of state interference would make that provision merely redundant of § 5, which is expressly directed against the state. Section 5, however, literally applies only to the passage of laws restraining freedom of speech or press and does not by its terms afford protection provided by § 4 against restrictions upon the exercise of those rights which government officials may impose whether or not sanctioned by law.[9]

---

[9] The issue of the redundancy of § 4 in view of § 5 was debated at the constitutional convention of 1818: "Mr. Treadwell, would leave out all the article—he considered the whole purpose of it answered in the next section.

"Mr. Bristol, could not agree with gentlemen, that the article was of no importance. Every citizen has the liberty of speaking and writing his sentiments freely, and it should not be taken away from him; there was a very great distinction between taking *away* a privilege, and punishing for an abuse of it—to take away the privilege, is to prevent a citizen from speaking or writing his sentiments—it is like appointing censors of the press, who are to revise before publication—but in the other case, every thing may go out, which the citizen chooses to publish, though he shall be liable for what he *does* publish—we are *not* to adopt the principles of a Star Chamber-Court, the Sec. was important; it was the very one which he wished to see

Despite the unqualified language of §§ 4 and 14, the plaintiffs do not maintain that the rights referred to therein are so absolute that they can lawfully be exercised anywhere, as a kind of public easement upon all privately owned realty for use as a political forum. Their claim is presently limited to the large regional shopping center operated by the defendants which, they contend, has assumed a uniquely public character by virtue of its great economic, social and cultural impact upon the community. We are unable, however, to discern any legal basis distinguishing this commercial complex from other places where large numbers of people congregate, affording superior opportunities for political solicitation, such as sport stadiums, convention halls, theatres, country fairs, large office or apartment buildings, factories, supermarkets or department stores.

The plaintiffs wish to have us balance the importance of the rights of free speech and petition which they seek to exercise against the interest of the defendants in controlling and operating their private property. The trial court, *Spada, J.,* concluded that experience during the six months that the plaintiffs had conducted their activities at the Mall pursuant to the injunction issued in *Cologne I, Bieluch, J.,* demonstrated no substantial impact upon the revenues or business expectations of the defendants. As a result of the violent confrontation which occurred on May 22, 1983, however, the court, *Ripley, J.,* found that there was a serious poten-

---

incorporated—Some further remarks were made by Mr. Bristol, and Mr. Pitkin, and the Sec. was approved and accepted." Connecticut Courant, Sept. 8, 1818, p. 3, col. 1.

The remarks of Mr. Bristol may be construed to indicate that he viewed § 4 (then § 6) as a limitation on § 5 (then § 7) which would authorize the passage of laws or the application of the common law with respect to defamation or sedition, but which would preclude any prior restraint. See *State v. McKee,* 73 Conn. 18, 28–29, 46 A. 409 (1900). A broader proposal which prohibited the molestation of any person for his opinions on any subject whatsoever was considered at the convention but rejected. Id.

tial for harm to the interests of the defendants if the plaintiffs continued to use the interior of the Mall for their activities because of the efforts of other groups to enjoy the same privilege. The injunction was modified accordingly to restrict the plaintiffs to an exterior entranceway. It is not the role of this court to strike precise balances among the fluctuating interests of competing private groups which then become rigidified in the granite of constitutional adjudication. That function has traditionally been performed by the legislature, which has far greater competence and flexibility to deal with the myriad complications which may arise from the exercise of constitutional rights by some in diminution of those of others. Some of these complexities have been demonstrated in the present case by the events of May 22, 1983, which, for that day at least, unquestionably disrupted the normal flow of business at the Mall and exposed the defendants to substantial risks of property destruction and liability to persons who might have been injured. Unlike first amendment liberties which occupy a preferred status in our constitutional framework; *Marsh* v. *Alabama,* 326 U.S. 501, 509, 66 S. Ct. 276, 90 L. Ed. 265 (1946); *Lockwood* v. *Killian,* supra, 502; *State* v. *McKee,* supra, 27–28; property rights or economic interests have long been regarded as subject to reasonable regulation in promotion of the general welfare. For the court to assume such a regulatory function, however, would relegate the legislature to a subordinate role in our governmental scheme. Statutes would become largely obsolete if courts in every instance of the assertion of conflicting constitutional rights should presume to carve out in the immutable form of constitutional adjudication the precise configuration needed to reconcile the conflict. If, as the plaintiffs contend, the development of large surburban shopping centers has greatly diminished opportunities for political advocacy in the public streets of downtown areas and other public

places, the problem should be presented to the legislature. We cannot presume that that body has any less concern for political liberty than this court.

As we have noted, the plaintiffs have not taken the extreme position which a literal reading of §§ 4 and 14 of article first might arguably warrant, that people seeking to exercise rights of free speech and petition have a constitutional right to do so wherever and whenever they please, but limit their claim to properties vested with a public character. Although we are under no legal constraint to follow *Lloyd Corporation* v. *Tanner,* 407 U.S. 551, 92 S.. Ct. 2219, 33 L. Ed. 2d 131 (1972), we approve the rejection in that decision of such a claim as applied to a shopping center: "Nor does property lose its private character merely because the public is generally invited to use it for designated purposes. . . . The essentially private character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center." Id., 569. If the furnishing of building permits, police protection and public transportation were deemed to constitute sufficient government involvement to transform the actions of the defendants in refusing the plaintiffs' requests into those of public officials, as the dissenting opinion assumes, almost every improved property would be subject to the same burden the plaintiffs seek to impose upon the Mall.

There is no error on the plaintiffs' appeals; there is error on the defendants' cross-appeal from the original judgment and the case is remanded with direction to render judgment for the defendants.

In this opinion HEALEY and COVELLO, Js., concurred.

PETERS, J. (dissenting). The narrow issue in this case is whether private owners of a vast shopping center, having freely invited the presence of the public at large,

may arbitrarily, absolutely and unconditionally exclude persons wishing peacefully to solicit signatures on political petitions and to distribute literature on political questions. In order to resolve that issue, we must determine a broader issue, the proper position of the right of political free speech under the constitution of Connecticut. This court has had no previous opportunity to explore the narrow issue, and little to explore the broader. Although it is therefore not surprising that we are in disagreement, I regret that the majority has chosen to narrow state constitutional rights to an extent supported neither by the language of our constitution nor by modern constitutional theorists. State courts today have the opportunity as well as the obligation, by virtue of our federal system, to begin to adapt state constitutional provisions to the issues presented by a society dominated by large industrial and commercial groups. Because I believe that the individual rights guaranteed by our state constitution's Declaration of Rights have a greater priority in our constitutional framework than the majority is prepared to recognize, I must dissent. For me, it is of critical importance that the plaintiffs are seeking to exercise free speech which is political in its nature and therefore central to the very existence of a democratic society, and that the plaintiffs' claim finds strong textual support in the language of article first, § 4, of our constitution. Although I therefore conclude that their claim should be substantively vindicated, I nonetheless would modify the judgment of the trial court, because I believe the remedy ordered by the trial court improperly and unnecessarily involved the trial court in regulation of the content of the plaintiffs' speech and of the time, place and manner in which their speech may be exercised.

The facts found by the trial court in its memorandum of decision are not disputed in the majority opin-

ion. For present purposes, it bears emphasis that the conduct of these plaintiffs has always been entirely peaceful and that their presence has neither provoked untoward political responses nor adversely affected the defendants' commercial activities. The unfortunate events which transpired in May, 1983, were in no way connected with the past or proposed conduct of the plaintiffs.[1] Furthermore, authorized activities at Westfarms Mall have never been entirely commercial. The Mall permits and sponsors various services and entertainments, such as health clinics, volunteer tax assistance facilities, informational programs, exhibitions, fashion shows, and concerts. The Mall's management policy statement that excludes the plaintiffs' peaceful petitioning expressly permits "labor activity."[2] Finally, the trial court expressly found that the facilities at the Mall provide a potential access to the public that is unmatched at other facilities which the defendants had contended were available as alternate sites for the plaintiffs' activities. "The Mall," in the words of the trial court, "has become the counterpart of the New England Green."

---

[1] The inability, ineptitude or ineffectiveness of law enforcement agencies to maintain peace and order with respect to other political actors should carry no weight in the protection of these plaintiffs' peaceful exercise of their constitutional rights.

[2] The defendants' written policy states: "Any unauthorized activity (exclusive of labor activity) in the common areas not directly related to the purpose for which Westfarms was developed regardless of whether that activity is conducted by one or more persons and regardless of whether that activity is peaceful or non-peaceful, will be considered unlawful trespassing and it will be treated as such by the owners and managing agents of Westfarms. By way of example, and not to be a complete list, the following are activities which constitute trespassing and will not be permitted: soliciting, speech making, distributing handbills or other literature, seeking signatures on petitions, or taking surveys (or anything else which might be classified as expressive activity). Our policy is based on the United States Supreme Court ruling in the case of *Lloyd Corp.* v. *Tanner*, 407 U.S. 551, 92 S. Ct. 2219, 33 L.E.2d 131 (1972). Westfarms is prepared to take every legal avenue to prevent such trespass and when required by the police, will prosecute violators to the full extent of the law."

## I

Analysis of the rights of the parties in this case must begin with recognition of the central role assigned by constitutional theory to the rights of petitioning the government and of free speech about political issues. Constitutional theorists have long been engaged in vigorous debate over the legitimacy and the appropriate scope of judicial authority in constitutional decisionmaking. The range of their controversy is as broad as that which appears to divide the economists. One of the few points of general agreement, however, is that "there is something special about speech." Bork, "Neutral Principles and Some First Amendment Problems," 47 Ind. L.J. 1, 23 (1971).

An appropriate starting point for the relationship between free speech and constitutional government is Justice Brandeis' concurrence in *Whitney* v. *California,* 274 U.S. 357, 47 S. Ct. 641, 71 L. Ed. 1095 (1927). There he wrote (p. 375): "Those who won our independence believed that the final end of the State was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine . . . . They recognized the risks to which all human institutions are subject. But they knew . . . that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the

path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones." As a well-known first amendment scholar has elaborated, the amendment "does not protect a 'freedom to speak.' It protects the freedom of those activities of thought and communication by which we 'govern.' It is concerned, not with a private right, but with a public power, a governmental responsibility." Meiklejohn, "The First Amendment is an Absolute," 1961 Sup. Ct. Rev. 245, 255.

Constitutional scholars of widely different persuasions agree that the "discovery and spread of political truth" is central to constitutional democracy. Professor (now Judge) Bork, a strict constructionist and an advocate of judicial restraint, although dissenting from part of the Brandeis argument for freedom of speech, agrees that political speech is a form of speech "that a principled judge can prefer to other claimed freedoms." Bork, supra, 26. Professor (now Dean) Ely, a constitutional moderate who advocates limited constitutional adjudication designed to secure broad participation in the processes and distributions of government, recognizes that "courts should be heavily involved in reviewing impediments to free speech" because first amendment rights "are critical to the functioning of an open and effective democratic process." J. Ely, Democracy and Distrust, p. 105 (1980). Professor Tribe, a constitutional activist who sees a role for freedom of speech beyond the political sphere, notes nonetheless that "freedom of speech is . . . central to the workings of a tolerably responsive and responsible democracy and . . . at least some of the first amendment's most convincing implictions follow directly from this perspective." L. Tribe, American Constitutional Law, p. 579 (1978).

While theoretical analysis has focused, for historical reasons, on the role of free speech under the first amendment to the United States constitution, the free speech provision of our own constitution has been held to embody the same understanding of the centrality of free speech to constitutional government. Our early case law stems from the time before incorporation of the first amendment into the fourteenth amendment came to dominate the field of protection of individual liberties. In *State* v. *McKee,* 73 Conn. 18, 28–29, 46 A. 409 (1900), this court stated: "The right to discuss public matters stands in part on the necessity of that right to the operation of a government by the people; but, with this exception, the right of every citizen to freely express his sentiments on all subjects stands on the broad principle which supports the equal right of all to exercise gifts of property and faculty in any pursuit in life, — in other words, upon the essential principles of civil liberty as recognized by our Constitution . . . . The general right to disseminate opinions on all subjects was probably specified mainly to emphasize the strong necessity to a free government of criticism of public men and measures." Very recently in *Grievance Committee* v. *Trantolo,* 192 Conn. 27, 36, 470 A.2d 235 (1984), we noted the special protection afforded to an attorney's publication that was political rather than commercial, when we said: "If the statement is political or ideological, it naturally enjoys the fullest protection under the first amendment to the United States constitution and article first, § 4, of the Connecticut constitution."

## II

The state constitutional framework for protection of the right of free speech rests principally upon the provisions of article first, §§ 4 and 5 of the constitution of Connecticut. Section 4 states: "Every citizen may freely speak, write and publish his sentiments on all

subjects, being responsible for the abuse of that liberty." Section 5 states: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press." In addition, § 14 states: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance." Read literally, these sections provide strong textual support for the plaintiffs' peaceful exercise of their rights.

As the majority opinion concedes, the plaintiffs' exercise of state constitutional rights is not foreclosed by the refusal of the federal courts to extend federal constitutional protection to expressive activity on private property. *Pruneyard Shopping Center* v. *Robins*, 447 U.S. 74, 81, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980), expressly recognized "the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution."

The majority holds that the plaintiffs cannot rely upon §§ 4 and 14, because these provisions of our constitution impliedly require the plaintiffs to show that acts of the state, rather than the conduct of private persons, interfere with their exercise of expressive rights. The majority's conclusion is based on three arguments: (1) the holdings of other state supreme courts interpreting similar state constitutional provisions are distinguishable; (2) the history of our state Declaration of Rights proves that its provisions were intended to protect individual liberties only against infringement by government; and (3) the balancing of state rights of free speech and petition against private rights of property is not a proper judicial function. I find these arguments unpersuasive.

A

A number of state supreme courts have interpreted their state constitutions, which contain language similar to §§ 4 and 14 of our constitution, to permit the free expression of political views without a prior showing of state action. The leading case, *Robins v. Pruneyard Shopping Center*, 23 Cal. 3d 899, 592 P.2d 341, 153 Cal. Rptr. 854 (1979), aff'd, 447 U.S. 74, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980), is factually indistinguishable from the case presently before us. There the court held that the free speech and petition provisions of the California constitution protected the peaceful exercise of these rights in a large but privately owned shopping center. The plaintiffs in *Robins* were soliciting signatures on a petition to be sent to the White House in Washington in order to express their opposition to a United Nations resolution against "Zionism." The *Robins* plaintiffs were afforded a right of access to the shopping center's internal courtyard, even though the center was bordered on two sides by public sidewalks and streets. In the view of the California Supreme Court, the state constitution's broad proclamation of speech and petition rights provided greater protection than the first amendment to the United States constitution. The state constitutional guarantees manifested a public interest in peaceful speech outweighing the desire of property owners for unlimited control over their property. This construction of the California constitution was accepted by the full court; the dissenters maintained only that the majority position violated federal constitutional guarantees protecting private property rights of the shopping center owner. On appeal, the Supreme Court of the United States, as previously noted, concluded that there was no federal impediment to California's application of California constitutional principles as interpreted by the California Supreme

Court. *Pruneyard Shopping Center* v. *Robins,* 447 U.S. 74, 88, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980).

The majority opinion in this case distinguishes *Robins* v. *Pruneyard Shopping Center* because the California constitution contains, in addition to guarantees of free speech and petition that are virtually identical to those found in our constitution, provisions for initiative, referendum and recall that we do not have. Those latter provisions were not, however, involved in *Robins* itself, since the *Robins* plaintiffs were not proposing changes in state law but were, instead, petitioning the federal government in order to influence federal policy.

Other state supreme courts have also recognized that state constitutional provisions like our own may afford protection not only against governmental or public bodies but, under appropriate circumstances, against private persons as well. The Supreme Court of New Jersey has held that state constitutional provisions may have a wider reach than the first amendment, because, in state cases, interpretation is not constrained by the principles of federalism and because state constitutions contain provisions separately guaranteeing individual rights and prohibiting governmental abridgement thereof. *State* v. *Schmid,* 84 N.J. 535, 559–60, 423 A.2d 615 (1980), appeal dismissed sub nom. *Princeton University* v. *Schmid,* 455 U.S. 100, 102 S. Ct. 867, 70 L. Ed. 2d 855 (1982). In determining that a private university was obligated to permit on-campus distribution of political materials by an off-campus organization, the court necessarily relied upon its view of the university's educational mission. The court could not, however, have reached that issue had it not first concluded that the absence of state action was not an absolute bar to its inquiry.

The Supreme Judicial Court of Massachusetts came to a similar conclusion in interpreting its constitutional

guarantee of free elections, again in the context of an attempted exercise of political speech at a large privately owned shopping center. Although the court chose to rely on the free election rather than on the free speech provision of the Massachusetts constitution,[3] it based its decision on the absence of language limiting its scope to governmental action alone. The court held that, in the absence of an expressed state action requirement, there was "no reason to imply such a requirement, and thereby to force a parallelism with the Federal Constitution." *Batchelder* v. *Allied Stores International, Inc.,* 388 Mass. 83, 88–89, 445 N.E.2d 590 (1983). The court went on to broaden its holding to "reject any suggestion that the Declaration of Rights should be read as directed exclusively toward restraining government action." Id., 89. Necessarily encompassed in that broader holding was the proposition that the right of free speech, found in article 16 of the Massachusetts Declaration of Rights, also has no state action constraints.

While these cases are not totally on all fours with the case presently before us, their reasoning is nonetheless apt. It is furthermore noteworthy that, except for one case, *State* v. *Felmet,* 302 N.C. 173, 273 S.E.2d 708 (1981), every recent state supreme court decision has followed the lead of *Robins* v. *Pruneyard Shopping Center* to afford some degree of protection for political speech even when the speaker is on private property. See, in addition to the cases cited above, *Commonwealth* v. *Tate,* 495 Pa. 158, 432 A.2d 1382 (1981); *Alderwood Associates* v. *Washington Environmental Council,* 96 Wash. 2d 230, 635 P.2d 108 (1981).

---

[3] Article 9 of the Massachusetts Declaration of Rights states: "All elections ought to be free; and all the inhabitants of this Commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employments."

Article 16 of the Massachusetts Declaration of Rights states: "The right of free speech shall not be abridged."

## B

Whether or not the decisions of other state supreme courts are distinguishable, it is indisputable that we are not bound by them. In the view of the majority, we should go a different route principally because the history of the adoption of our Connecticut Declaration of Rights demonstrates that the framers of the Connecticut constitution intended to protect individual liberties only from infringement by government and not from interference by private persons.

Although the concerns that marked the adoption of our constitution are admirably described in the majority opinion, I am unpersuaded that these concerns are entitled to the weight that the majority assigns to them. I am troubled about the extent to which the intent of the draftsmen, even of the draftsmen of a constitution, should be permitted to introduce ambiguity into constitutional language that is, contextually speaking, reasonably clear. I wonder, further, about the extent to which it is appropriate to extrapolate, from the draftsmen's responses to concerns with which they were familiar, how they would have reacted to concerns entirely beyond their realm of experience.

As the majority opinion recognizes, on their face the relevant provisions of the Connecticut constitution afford protection for freedom of speech and for the right to petition without regard to the source of the interference with these constitutionally guaranteed rights. There is no mention of governmental action in either § 4 or § 14 of article first. By contrast, § 5 of article first expressly invokes state action when it states: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press." At the very least, the conjunction of §§ 4 and 5, both of which address freedom of speech, underscores that under our

constitution as well as under the first amendment to the federal constitution, freedom of speech is "special" and is entitled to a preferred position over other, competing constitutional rights. See *United States* v. *Carolene Products Co.*, 304 U.S. 144, 152–53 n.4, 58 S. Ct. 778, 82 L. Ed. 1234 (1938).

When constitutional provisions, read in context with each other, guarantee constitutional rights, subject only to the explicit limitation that they shall not be abused, is it proper to add an additional limitation that the constitution itself does not contain? While the intent of the framers is an important resource to *resolve* ambiguity, it is not an appropriate resource to *create* ambiguity. As Dean Ely notes, it is important "to bring to the fore what seems invariably to get lost in excursions into the intent of the framers, namely that *the most important datum bearing on what was intended is the constitutional language itself.*" (Emphasis in original.) J. Ely, Democracy and Distrust, p. 16 (1980). We have recognized the same rule of construction in *Borino* v. *Lounsbury,* 86 Conn. 622, 625, 86 A. 597 (1913), where we relied on 1 Story on the Constitution (5th Ed.) §§ 405, 407, to limit the role of evidence of the intent of the framers of the Connecticut constitution. Quoting Story, we held that where the words of the constitution "are plain, clear, and determinate they require no interpretation; and it should, therefore, be admitted, if at all, with great caution, and only from necessity, either to escape some absurd consequence, or to guard against some fatal evil. . . . Contemporary construction is properly resorted to, to illustrate and confirm the text, to explain a doubtful phrase, or to expound an obscure clause. . . . It can never abrogate the text, . . . it can never narrow down its true limitations, it can never enlarge its natural boundaries."

These principles of construction would require, it seems to me, that the intent of the draftsmen would

not supersede the clear language of the constitution itself unless the intent of the framers were indisputably clear with respect to the particular provision arguably subject to implied limitation. The case for deference to the draftsmen is not that strong here.

Any inference about the intent of the draftsmen is beset by logical difficulties. "[N]ot everyone will feel called upon to place in the 'legislative history' his precise understanding, assuming he has one, of the meaning of the provision for which he is voting or to rise to correct every interpretation that does not agree with his." Ely, op. cit. 17; Brest, "The Misconceived Quest for the Original Understanding," 60 B.U.L. Rev. 204, 214–15 (1980). Even if the meaning of the constitutional convention as a whole could be ascertained, that meaning, if not reflected in the words of the constitution itself, cannot be dispositive. "For as the constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed." T. Cooley, A Treatise on the Constitutional Limitations * 66–67 (2d Ed. 1871), quoted in Ely, supra, 17–18.

Furthermore, the principal agenda of the constitutional convention of 1818 was to bring about a radical change not in personal freedoms, but in the basic organization of government. "Prior to 1818, the whole sovereign power was exercised by the people . . . through a body of magistrates chosen annually and deputies chosen semi-annually . . . . It was [a] new form of government that the people demanded and established in 1818. The idea of [the 1818] . . . consti-

tution was centered in the separation of judicial and legislative powers, and the grant of each power to a distinct magistracy. On this the fight for change of government was largely made." *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 586-87, 37 A. 1080 (1897). Such an agenda for structural change necessarily focuses attention on the grant of governmental powers rather than on the reservation of individual rights. To the limited extent that the drafters considered freedom of speech, their apparent concern was only to balance the liberty of speaking with the power of government to punish speech which is libelous. *State* v. *McKee,* 73 Conn. 18, 29, 46 A. 409 (1900); and see *State* v. *Pape,* 90 Conn. 98, 105, 96 A. 313 (1916). So limited a discussion can hardly be deemed to constitute a comprehensive contemporaneous construction either of the rights afforded by the Declaration of Rights or of the abuses that the Declaration forbids; it does not, for example, address the continued right of private parties to litigate privately a common law action for libel or slander.

Finally, and most significantly, the search for the intent of the framers is, in this case, inherently anachronistic. Of necessity, the constitution of 1818 was adopted in light of the ideologies and the practices, the politics and the economics, of that time. The source of interference with personal freedoms with which the draftsmen had had recent experience was the government. The society in which they lived was predominantly rural, marked by small towns, by country stores and village squares.[4] I do not believe that we can be reasonably certain that the framers had any views, any intentions, about the proper role of free speech in a

---

[4] In 1820, the largest Connecticut town was New Haven with a population of 8327. Except for Hartford with a population of 6901, and Middletown with a population of 6479, all the remaining towns had a population of less than 5000 people. Connecticut State Register and Manual (1983) pp. 576–81. In marked contrast, the 1980 census revealed that 2,449,233

mobile urbanized society when what is at issue is the exercise of free speech in a vast privately owned shopping center located at the intersection of superhighways. If they understood a constitution in the same way as John Marshall interpreted it, only a year later, in *McCulloch* v. *Maryland,* 17 U.S. (4 Wheat.) 316, 415, 4 L. Ed. 579 (1819), they would have recognized that "a constitution intended to endure for ages to come . . . [must] be adapted to the various crises of human affairs." See Munzer & Nickel, "Does the Constitution Mean What It Always Meant," 77 Col. L. Rev. 1029, 1033, 1058–62 (1977).

For all of these reasons, I believe that the limitations which the majority seeks to import into the language of §§ 4 and 14 of article first cannot be justified by resort to history. The intentions of the framers are, at best, indeterminate, and therefore cannot override the language of the constitution itself.

## C

If the plaintiffs have constitutionally cognizable claims, they have a right to have these claims adjudicated in this court. Courts that have the competence to determine whether an act of the legislature meets constitutional muster surely have the competence to determine whether private conduct is constitutionally suspect. Our constitutional review is not invariably limited to consideration of legislation. In assuring a criminal defendant's right to a fair trial, for example, we look directly to the underlying provisions of our constitution. *State* v. *Ferrell,* 191 Conn. 37, 40–41, 463 A.2d 573 (1983); and see *State* v. *Ubaldi,* 190 Conn. 559, 572–75, 462 A.2d 1001 (1983). The issue is not whether this court, or the legislature, is the more zealous guar-

of the state's 3,107,579 inhabitants (78.8 percent) now live in urban areas. 1980 Census, General Social and Economic Characteristics, Connecticut 8-15. See also Taeuber & Taeuber, The Changing Population of the United States, pp. 112–13 (1958).

dian of political liberty; concededly, we all take the same oath to uphold constitutional rights. The question is rather whether these plaintiffs are constitutionally required to defer their claims until they succeed in getting on the legislative agenda. I know of no authority for such deferral of their constitutional claims.

Nor can the claims of these plaintiffs against these defendants be denied because their adjudication requires us to strike a balance among competing legitimate interests. Courts are continually called upon to draw lines, on a case-by-case basis. The absence of discernible bright lines is not unique to this litigation. Although we should exercise particular care in defining the limits of the constitutional rights that we recognize, we must nonetheless be faithful to our duty to implement the constitutional protections that our constitution provides.

I would therefore conclude that the provisions of §§ 4 and 14 of the Connecticut constitution may, in the proper circumstances, protect the political speech which the plaintiffs seek to exercise. The language of the constitution strongly supports their claim, and the history of the constitution does not conclusively refute it. Like the supreme courts of other jurisdictions, we should adjudicate this claim on the merits.

### III

The claim of the plaintiffs that they may exercise constitutionally guaranteed rights of political free speech and petition on privately owned property is, as the majority recognizes, a limited claim. It is limited because the site in question is one which, as the trial court found, has assumed a uniquely public character by virtue of its great economic, social and cultural impact upon the community. It is limited because the plaintiffs do not seek unrestricted access, but take issue instead with the defendants' assertion of an absolute,

unconditional right to preclude their exercise of their constitutional rights. The majority opinion does not take direct issue with these limitations, or with this description of the plaintiffs' claim. If there is factual and legal support for this limited claim, as I believe there is, then the plaintiffs have established their right to invoke the relevant provisions of our constitution's Declaration of Rights.

In my view, the Connecticut constitution gives the plaintiffs the right to speak peacefully about their political concerns without regard to the presence of any special form of state action. Even if I am wrong about that proposition, however, these plaintiffs can still prevail because this record adequately demonstrates governmental involvement in the denial of their access to a political forum. I do not understand how the majority opinion, which interprets our constitution to require such governmental involvement, can fail to address this crucial issue.

If we are to import a state action requirement into the Connecticut constitution, we must recognize that its contours will necessarily differ from the state action concept that has developed under the constitution of the United States. In part, at least, the state action requirement is designed to address the demands of federalism, to create space for state regulation. L. Tribe, American Constitutional Law, pp. 1149–50 (1978). Because there is no "federalism" component to state action under state constitutions, any state standard for government involvement should be more flexible, and should require less definitive government action than is required under federal law. See *Sharrock* v. *Dell Buick-Cadillac, Inc.*, 45 N.Y.2d 152, 160, 379 N.E.2d 1169, 408 N.Y.S.2d 39 (1978); Berdon, "Protecting Liberty and Property Under the Connecticut and Federal Constitutions: The Due Process Clauses," 15 Conn. L. Rev. 41, 53–54 (1982).

The law of state action under the federal constitution nonetheless furnishes a useful point of departure. That law has, to date, developed no precise, rigid test, no unitary theory, for determining what conduct is governmental and what is private. Instead, the state action requirement reflects a balance in which a crucial factor is the substantive right which is sought to be exercised. "Whether governmental authority is so significantly involved in nominally 'private' actions as to constitute state action is a determination involving both the nature of the discrimination and the extent of the governmental involvement." *Lockwood* v. *Killian,* 172 Conn. 496, 503, 375 A.2d 998 (1977); *Moose Lodge No. 107* v. *Irvis,* 407 U.S. 163, 172, 92 S. Ct. 1965, 32 L. Ed. 2d 627 (1972); Tribe, op. cit. 1157–59. Just as state action will more readily be found for a claim of racial discrimination, as opposed to any other form of discrimination, so too the preferred position of freedom of speech entitles that claim to a special position in an assessment of state action. *Lockwood* v. *Killian,* supra, 502–503.

Viewed against the plaintiff's preferred claim to speak freely on political questions, the defendants' operation of their vast shopping center demonstrates significant government involvement. As in *Shelley* v. *Kraemer,* 334 U.S. 1, 14–18, 68 S. Ct. 836, 92 L. Ed. 1161 (1948), the defendants rely on governmental institutions to enforce their privately drafted exclusionary "management policy." As in *Marsh* v. *Alabama,* 326 U.S. 501, 507–508, 66 S. Ct. 276, 90 L. Ed. 265 (1946), the defendants have created a public forum by the extent to which they have opened up their property for use by the public in general.[5] As in *Burton* v. *Wilming-*

[5] The defendants themselves recognize, by the stated exception in the management policy for "labor activity," that they must provide access to labor unions for the purpose of communications relating to union activities. See 29 U.S.C. § 157; General Statutes § 31-104. The United States Supreme Court held, in *Hudgens* v. *National Labor Relations Board,* 424

*ton Parking Authority,* 365 U.S. 715, 723–26, 81 S. Ct. 856, 6 L. Ed. 2d 45 (1961), there is a relationship of interdependence between the defendants and the government, which furnishes them with building permits,[6] police patrols and public transportation. In their totality, these facts demonstrate sufficient state action for state constitutional purposes.

## IV

The conclusion that the plaintiffs have a constitutionally protected presence at the defendants' privately owned shopping center does not itself establish the extent of the plaintiffs' rights. Their rights, though preferred, are not absolute, and must be balanced against the defendants' rights to free speech and to reasonable use of their property. Although I would agree with the trial court's determination that this balance in this case must be struck in the plaintiffs' favor,[7] I believe that the trial court's remedial approach excessively involved the court in the details of the plaintiffs' speech and in the manner of its exercise.

U.S. 507, 521–22, 96 S. Ct. 1029, 47 L. Ed. 2d 196 (1976), that unions have a statutory but not a constitutional right of access to privately owned shopping centers. Whether or not such a conclusion would be reached under our state constitution, the unconditional access afforded to labor activity by the defendants supports a conclusion that the defendants' use of their property serves the functions of a public forum.

[6] We may take judicial notice of the fact that Westfarms straddles the boundary between West Hartford and Farmington. West Hartford zoning regulations contain provisions for a variety of business districts, including a category denominated "Central Business District (BC) and Shopping Center District (BS)." The zoning ordinance specifies that "[t]he purpose of these districts is to encourage the concentration of a wide variety of stores, services and activities serving the entire town as major shopping *and community* centers . . . . They are intended to be properly related to the major road system and, if possible, served by public transit . . . ." (Emphasis added.) West Hartford Code § 177-3 B (4).

[7] The events that led to the amended appeal did not, in my view, authorize a different balance to be struck. Although the trial court, *Ripley, J.,* had jurisdiction to consider the relevance of a violent reaction to spokesmen entirely unrelated to the plaintiffs, it had no substantive basis to depart from the judgment previously rendered by *Spada, J.*

In order to implement its conclusion that the defendants could not deprive the plaintiffs of all access to the shopping center for free speech purposes, the trial court should have enjoined the defendants from further enforcement of their existing "management policy." The defendants' policy should not have been permitted to continue in force because of its categorical and unconditional prohibition of the plaintiffs' activities. Injunction of that policy was therefore required. Once this unconditional prohibition had been eliminated, however, the defendants should have been given the opportunity to develop reasonable time, place and manner limitations to regulate the plaintiffs' presence. Unless and until it was faced with an urgent need for further intervention, the court should have refrained from prescribing the details of the plaintiffs' presence or the content of the plaintiffs' speech. Courts are better suited to the adjudication of constitutional rights than to the day by day regulation of shopping centers.

With modification of the order of injunctive relief, limiting the injunction to invalidation of the defendants' "management policy," I would affirm the judgment of the trial court.

In this opinion SPONZO, J., concurred.