[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
INITIAL MEMORANDUM OF DECISION ON RESPONDENTS' AMENDED MOTION TODISMISS
Pursuant to a Presentment of Attorney for Misconduct dated March 3, 1997, the Statewide Grievance Committee has alleged that the respondents, Thomas J. Tyler and Russell J. Tyler, have been guilty of misconduct involving their character, integrity and professional standing, and has requested that the Court impose whatever discipline it deems appropriate. To summarize and simplify, the presentment alleges that the Tylers owned interests in certain real estate properties in Enfield, that they represented some of the purchasers at the closings of these properties, and that they did not advise their client purchasers of their interest — or the interest of their business partner, Patrick W. Reilly — in the properties. The presentment alleges that the alleges that the respondents also represented banks at the closings of these real estate properties, and failed to advise the banks of their interest — or the interest of their business partner — in the properties. The presentment alleges that the respondents' representation of the client purchasers and the banks in the real estate closings, without the consent of the purchasers and banks after consultation, was materially limited by their own interests and the interests of their business partner in violation of Rule 1.7(b) of the Rules of Professional Conduct.[1]
CT Page 8996
Pursuant to an Amended Motion to Dismiss dated April 3, 1997 and a memorandum of law in support, the respondents in the above matter have moved to dismiss the presentment in this case. The Statewide Grievance Committee has filed an objection to the Amended Motion to Dismiss dated April 9, 1997. Respondents filed a supplemental memorandum in support of their motion to dismiss dated May 16, 1997. The Statewide Grievance Committee filed a supplemental memorandum of law also dated May 16, 1997, in support of their objection, and another supplemental memorandum, dated August 29, 1997, to which respondents replied in a September 4, 1997, memorandum.
On June 3, 1997, a hearing was held, at which testimony was taken relating to the issues raised in the motion to dismiss. Following a period of delay during which a transcript of the hearing was produced, counsel were invited to supplement their earlier memoranda if they wished.
I have now reviewed all of the submissions made, reviewed the cases cited, reviewed the transcript of the June 3 hearing, and considered the arguments put forth. For the reasons stated, the motion to dismiss is denied in part; however, a further evidentiary hearing is required so that the Court can hear testimony concerning the composition of the reviewing committee which heard the Tyler matters. Each of the arguments put forth by respondents will be discussed in sequence.
1. Was the Reviewing Committee Validly Constituted?
Respondents' first claim is that the reviewing committee, which voted to file a presentment against them, was not validly constituted as required by Connecticut Practice Book Section 27J and Connecticut General Statutes Section 51-90g(a). Respondents note that both Practice Book Section 27J(a) and General Statutes Section 51-90g(a) provide that a Reviewing Committee shall consist of at least three members of the statewide grievance committee.[2] Because it is undisputed that only two members of the reviewing committee — Attorney Harold B. Schramm and Carmen Donnarumma — actually participated in the deliberative process and signed the proposed decision recommending presentment, respondents argue, the process was flawed and dismissal is required. In support of their argument, respondents rely on Lewisv. Statewide Grievance Committee, 235 Conn. 693 (1996), andHartford v. Local 716 Counsel for AFSCME, 44 Conn. Sup. 312
CT Page 8997 (Berger, J. 1996), Affd 43 Conn. App. 800 (1997), as well as other cases.
I agree in part with the Statewide Grievance Committee's arguments that the reviewing committee was sufficiently constituted. The present record indicates, notwithstanding some ambiguity concerning its composition, that it was comprised of atleast three members as required, with two signing the proposed decision.[3] Rule 7F of the Statewide Grievance Committee Rules of Procedure states that "All determinations of a reviewing committee shall be by an absolute majority vote and two members [of a reviewing committee] shall constitute a quorum. In the event of a tie vote, a member of the Statewide Grievance Committee shall be designated to review the entire record of the complaint and cast the deciding vote." As our Supreme Court stated in Lewis v. Statewide Grievance Committee, at page 707, citing Pet v. Dept. of Health Services, 228 Conn. 651, 672
(1994):
 [N]either [Practice Book Section 27J(a) nor General Statutes Section 51-90g(a)] . . . requires that all designated members of a reviewing committee attend grievance hearings. In fact, statewide grievance committee rule of procedure 7F establishes that, once empowered to act, a quorum of the reviewing committee can act for the whole, although a majority vote is needed for a proposed decision. Reading into these provisions a requirement that all designated members of a reviewing committee must attend grievance hearings is contrary to analogous precedent.
Rather than support respondents' argument, I believe thatLewis refutes it. As the Statewide Grievance Committee notes in its May 16, 1997, and August 29, 1997, supplemental memoranda, in the event of a tie vote — as in Lewis — Rule 7F of the Statewide Grievance Committee's Rules of Procedure provides that a member of the Statewide Grievance Committee shall be designated to review the entire record of the complaint and cast the deciding vote. Rule 7F "was implicitly approved in Lewis v. StatewideGrievance Committee," Hanson v. Statewide Grievance Committee,
CV-96-0560441, Judicial district of Hartford/New Britain at Hartford (January 30, 1997) (McWeeny, J.), appeal filed, AC No. 16907 (Conn.App. Feb. 19, 1997). There was no tie vote in the instant case, and therefore no need to invoke this provision. Seealso Ghent v. Zoning Commission, 220 Conn. 584, 598 (1991);Levinson v. Board of Chiropractic Examiners, 211 Conn. 508
CT Page 8998 (1989). Neither does the decision in the Hartford v. Local 716Counsel for AFSCME support respondents' argument. In that case, the chairperson of a private arbitration panel excluded the remaining members of a three member panel from their deliberations. Id. at 317. No such conduct occurred here. Nor does the Hanson decision, discussed by respondents n their September 4, 1997, submission, assist them, in my view. Rather, it supports the position of the Statewide Grievance Committee.
However, the testimony and evidence produced at the hearing has brought to light a closely-related concern relating to ambiguities about the actual composition of the reviewing committee which heard and decided the Tyler matters. See Endnote 3. Specifically, based on the full record, it is still not clear to the Court if the reviewing committee which heard the evidence and issued its proposed decision in the consolidated Tyler matters was composed of three members, or four members. The difference is far from academic, given the above-cited requirement of Rule 7F, noted by the Supreme Court in Lewis, that "All determinations of a reviewing committee shall be by anabsolute majority vote . . ." (Emphasis added.) While two votes comprises a quorum of a three person committee, and is an absolute majority of a three person committee, two votes is not
an absolute majority — half plus one — of a four person committee. The evidence indicates that the two Tyler matters — initially assigned to two different committees, both including Messrs. Donnarumma and Schramm — were, at some point, consolidated. Both Mr. Schramm and Mr. Donnarumma testified that this was their understanding. Both Mr. Schramm and Mr. Donnarumma were clear that neither Mr. Belinkie nor Mr. Walsh took part in any of the Tyler proceedings or deliberations. Mr. Donnarumma testified that he believed that either Belinkie and/or Walsh "didn't show, were excused." Transcript 6/3/97 at 156. "They never really became part of the hearing panel." He also testified, however, that he understood that the reviewing committee "originally . . . was Al Belinkie and then eventually Jim Walsh." Transcript 6/3/97 at 165. Mr. Schramm said in response to a question: "Well, I know that only two participated. How many were initially assigned, I can't answer that. From this there were three." Transcript 6/3/97 at 134.
In summary, reviewing the full present record, it is not possible to determine whether the reviewing committee which heard the consolidated Tyler members — irrespective of the fact that only two members participated, and acknowledging the fact that CT Page 8999 typically a reviewing committee is comprised of three members — was in fact composed of three members or four members when it heard the evidence in the case and issued its proposed decision.
Consequently, the Court requires more testimony on this issue in order to analyze properly and fully resolve the pending motion. The Court therefore requires a further hearing at which both Mr. Belinkie and Mr. Walsh will be required to give testimony. Counsel are also ordered to consult to discuss what evidence and documents, if any, ought to be brought to the Court's attention, and what stipulations, if any, can be reached, to clarify the reviewing committee's composition at all relevant time periods. A hearing shall be scheduled after counsel have conferred and determined when Messrs. Belinkie and Walsh are available.
2. Were the Respondents Denied Due Process Because the Attorney Prosecuting the Presentment Also Served as Legal Advisor to the Reviewing Committee?
Respondents' second argument is that they were denied due process because the attorney prosecuting the grievance complaint in this case, Attorney Maureen A. Horgan, also served as legal advisor to the reviewing committee during hearings in this matter, and participated in these hearings. Respondents correctly argue that they are entitled to a fair and impartial tribunal.Cologne v. Westfarms Associates, 192 Conn. 48, 57 (1984). They were deprived of such a fair hearing in this case, they claim, because of the role played by Attorney Horgan. To the extent that relevant grievance statutes and Practice Book provisions fail to separate the adjudicatory and investigative functions from the prosecutive, they are constitutionally deficient, argue respondents. Respondents cite numerous cases which, they claim, generally support their argument. See Wong Yana Sung v. McGrath,339 U.S. 33, 45-46 (1950); Jutkowitz v. Department of HealthServices, 220 Conn. 86 (1991); People Ex Rel. Woodard v. Brown,770 P.2d 1373 (Colo., App. 1989). But they cite no case which directly supports their claim.
In the absence of authority directly supporting their argument, it must be rejected, for a number of reasons. Preliminarily, of course, it should be noted that respondents bear a heavy burden when challenging the constitutionality of laws and related rules relating to attorney discipline. Cf.,CT Page 9000State v. Breton, 212 Conn. 258, 269 (1989).
As the Statewide Grievance Committee notes, a principal function of an assistant bar counsel is to "[a]ssist the statewide grievance committee and the reviewing committee in carrying out their duties . . ." Practice Book Section 27H(b)(6). An assistant bar counsel shall, at the request of the statewide grievance committee, "prepare and file complaints initiating presentment proceedings in the superior court . . . and prosecute same." Practice Book Section 27H(b)(7). The grievance committee is authorized by General Statutes Section 51-90g and related rules of practice, to "act as an arm of the court in fulfilling . . . [its] responsibility." Massameno v. StatewideGrievance Committee, 234 Conn. 539, 554 (1995), citing StatewideGrievance Committee v. Rozbicki, 211 Conn. 232, 239 (1989). "Such statutes as ours are not restrictive of the inherent powers which reside in courts to inquire into the conduct of their own officers, and to discipline them for misconduct." Rozbicki at 239, citing In Re Peck, 88 Conn. 447, 457 (1914). Assistant bar counsels assist reviewing committees prior to their issuing a proposed decision. If the Statewide Grievance Committee votes to present a respondent, the r role requires them to prepare, file and prosecute the presentment. I agree with the Statewide Grievance Committee's arguments on this issue and conclude that this procedure is logical, an effective use of resources, and that there is nothing inherently unfair or unconstitutional about it. "The existence of a relationship which suggests only a remote and tenuous possibility of unfairness, is not sufficient to overcome [the presumptions of regularity, validity, and constitutionality of administrative agencies]." People Ex Rel. v.Brown, 770 P.2d 1373, 1376 (Colo.App. 1989).
Respondents' argument might be more persuasive if the assistant bar counsel actually voted to impose discipline, or played a direct role in the imposition of sanctions. See, e.g.,Philadelphia Board of Pensions Retirement v. Amanto,510 A.2d 846 (Pa.Cmwlth. 1986) (City solicitor's action in serving as counsel for hearing panel and later casting vote against employee seeking disability benefits constituted an impermissible commingling of prosecutorial and adjudicatory functions in violation of employee's due process rights.) But those functions are delegated to other actors in our system. And ultimately, as our Supreme Court has repeatedly stressed, the imposition of sanctions — the decision making function — rests with the court. As our Supreme Court noted in Rozbicki at 238: CT Page 9001
 The proceeding to disbar [or suspend] an attorney is neither a civil action nor a criminal proceeding, but is a proceeding sui generis, the object of which is not the punishment of the offender, but the protection of the court . . . Once the complaint is made, "the court controls the situation and procedure, in its discretion, as the interests of Justice may seem to it to require." In re Peck, supra.
 See also Statewide Grievance Committee v. Presnick,215 Conn. 162, 167 (1990) ("The ultimate decision as to whether an act of misconduct has occurred repose[s] . . . solely with the judge, as . . . [does] the power to administer an appropriate sanction.")
The case of Jutkowitz v. Department of Health Services,220 Conn. 86 (1991), does not speak directly to this issue. In that case, the plaintiff, a chiropractor, raised a similar claim. The Supreme Court did not directly address the claim, concluding that the plaintiff did not suffer material prejudice from the line of questioning at issue. Id. at 99.
3. Were Respondents Denied Due Process Because of Delay In Having the Matter Heard, During Which Time the Members of the Reviewing Committee Had Access to An Ex Parte Communication from Complainant's Attorney?
The record indicates that the grievance in this case was filed by Patrick Reilly on April 19, 1994. Respondents concede that the transactions which formed the basis for the grievance occurred, for the most part, during the period between the mid-1980s to 1990, with a last closing occurring in March of 1991. Respondents' Memorandum of Law in Support of Motion to Dismiss Dated March 31, 1997, at page 2. Respondents claim that delays in the proceedings should result in dismissal. This argument is unpersuasive.
As the Statewide Grievance Committee notes at page 4 of its April 19, 1997, Objection to Motion to Dismiss, the Committee has no control over when grievances are filed. Pursuant to Practice Book Section 27F(a)(2)(E), the Statewide Bar Counsel, in conjunction with the Statewide Grievance Committee, can exercise its discretion to dismiss a grievance complaint alleging "conduct occurring more than ten years prior to its filing." Before CT Page 9002 October 1, 1994, when this rule was adopted, there was no such time limit. In the instant case, the grievance complaint was filed within the 10 year rule — which was not yet even applicable. Moreover, respondents have shown no actual prejudice caused by whatever delays have occurred, although, to be sure, the pendency of such proceedings is always a matter of deep concern.
The second half of respondents' third argument is that the grievance process was tainted because members of the reviewing committee in the Tyler matter were exposed to "ex parte" communications made in a related matter which might have influenced them in their decision in the instant cases. This argument deserves detailed analysis because it relates to the very integrity of the decision-making process. This review is undertaken in light of the oft-stated principle that the actions of an administrative agency are entitled to a presumption of regularity, validity and constitutionality. People Ex. Rel. v.Brown, 770 P.2d 1373, 1376 (Colo.App. 1989).
More specifically, respondents argue that Messrs. Donnarumma and Schramm were exposed to an "ex parte" communication which was part of the file in the matter of Reilly v. Sherman, another grievance complaint brought by the same grievant who filed a complaint against the Tylers. See Defendant's Exhibit A. Relying on Henderson v. Department of Motor Vehicles, 202 Conn. 453,457-458 (1987), respondents argue that once it has been demonstrated that members of the reviewing committee were exposed to an ex parte communication, see General Statutes Section 4-181, a presumption of prejudice is deemed to arise. Respondents argue that the burden of rebutting this presumption of prejudice is on the Statewide Grievance Committee.
Preliminarily, it should be noted that Respondent's Exhibit A, the purportedly "ex parte" communication, was filed by Attorney Breetz in the Sherman matter — not the Tyler matters — and that, by its own terms, see Exhibit A, first paragraph, it was filed in response to a request for information by the Grievance Committee. The Court rejects any implication created by the somewhat questionable use of the term "ex parte" that the filing of the letter was in any way inappropriate or improper.
The facts of Henderson, in which an adjudicator privately conversed with a witness prior to the commencement of a motor vehicle hearing, are c early distinguishable. Notwithstanding this distinction, review of the letter leads me to conclude that CT Page 9003 it contains material which, had it been reviewed by a member of the Tyler reviewing committees, could have influenced their deliberations on the Tyler matters to the unfair detriment of the Tylers.
However, review of the June 3 hearing transcript persuades me that there is no persuasive evidence in the record supporting respondents' argument that any member of the reviewing committee in their matters reviewed Respondent's Exhibit A. The record indicates that the reviewing committee initially selected to hear the Sherman matter properly recused itself before any involvement in that case so as to avoid prejudice to Mr. Sherman based on their prior acquisition of information, during the Tyler proceedings, relating to the grievance in that case. Mr. Donnarumma testified that he had resolutely made up his mind that he would not serve or the Sherman matter and therefore read no part of the file. Tr. 6/3/97 at page 151. Moreover, his testimony was that he would have signed off on the draft proposed decision within 3 to 5 days after receiving it in March 1995 — well before he received the Sherman assignment. See Plaintiff's Exhibit 7, notice of assignment in the Sherman matter. The record makes it clear that the proposed decision ultimately issued was identical to the draft proposed decision distributed in March, 1995. I fully credit the testimony of Mr. Donnarumma.
Review of Mr. Schramm's full testimony likewise indicates that he was not exposed to Defendant's Exhibit A. Initially, curing questioning at the June 3 hearing, Mr. Schramm was less than unequivocal when asked if it was "possible" that he would have reviewed the Sherman file. Transcript 6/3/97 at 106. Possibilities, however, are no substitute for proof. He also testified that because he never took part in the Sherman matter, and because he would have as a normal procedure reviewed any such file just before the hearing, he had no specific recollection of the Breetz letter, Respondent's Exhibit A. Transcript 6/3/97 at 111-113. Moreover, he testified that he signed the proposed draft decision prior to his abortive assignment to the Sherman matter, within 5-7 days of receiving the draft proposed decision in March, 1995. I see no reason in the record to doubt his testimony that his decision in this matter was based upon the material he heard at the hearings and was rendered immediately afterwards without taint from anything that came in after that. I also credit his testimony fully. Viewing the record as a whole, I conclude that even if the Statewide Grievance Committee bears the burden of rebutting a claim of prejudice under the logic of CT Page 9004Henderson — an arguable proposition given the clear factual distinctions between Henderson and this case — that burden has been met in this case.
4. Must the Grievance Be Dismissed Because the Complainant Lacked Standing to File It?
Respondents next argument is that the grievance must be dismissed because the complainant, Patrick Reilly — not being a client of respondents — lacked standing to file it. This argument is unconvincing and misapprehends the broad scope of the rules relating to the filing of grievance complaints against attorneys.
Pursuant to Practice Book Rule 27F(a), "Any person . . . may file a written complaint alleging attorney misconduct whether or not such alleged misconduct occurred in the actual presence of the court." (Emphasis added). The rule does not require that the complainant have an attorney-client relationship with the lawyer against whom the grievance is filed, nor is there a requirement that the person allege that he was personally harmed. This broad rule is fully consistent with the essential purposes of the attorney grievance procedures. As noted above, they are neither civil nor criminal procedures, but sui generis procedures to protect the court — and therefore the public — by permitting air and efficient disciplining of attorney misconduct which comes to the court's attention, from whatever source. Therefore, the standing rules that respondents rely upon, while arguably germane in other legal contexts, are not directly relevant to the analysis in this case. Moreover, it takes no great imagination to envision situations in which only third parties, not represented by counsel and not being personally injured, have the knowledge — or the motive — to bring attorney misconduct to the attention of the courts. To adopt respondents' restrictive reading of the standing requirements would discourage such desirable conduct. Given the plain, expansive language of Rule 27F(a) and the goals the rule is designed to promote, the court declines respondents' request to read a standing requirement into the rule.[4]
5. Must a Grievance Complaint Be Dismissed Where the Complainant Files the Grievance for an Improper Purpose?
Finally, respondents argue for dismissal because, they assert, the grievance in this case was filed for an "improper CT Page 9005 purpose." This argument is set out in detail at pages 15 through 17 of the memorandum of law in support of the motion to dismiss. Respondents have set out a time line of events which, they contend, demonstrates that the grievance in this case was filed by the complainant in retaliation for a separate and collateral civil matter which was brought by respondents against complainant. Respondents argue that on May 27, 1994, complainant's attorney suggested mediation of a case brought by respondents would avoid ethical problems for respondents. They rely in part on the case of Mozzochi v. Beck, 204 Conn. 490, 501
n. 8 (1987). Respondents argue, in essence, that this grievance was brought as a means of gaining "leverage" in another forum.
It is course a reality that persons can resort to legal process, in a variety of settings, for a variety of different reasons. Some may seek vindication of their legal rights or the rights of others; some make seek revenge; others may act out of the highest and most altruistic motives and concern for the public; still others may be moved by less noble desires. But when all is said and done, it is clear that the focus of a grievance procedure is and must be not on the motive of the grievant but the conduct of the respondent. As the Statewide Grievance Committee argues, a "proper" purpose is not a prerequisite to the filing of a complaint with the statewide bar counsel pursuant to Section 27F(a). For the court to impose a requirement that complainants have a "proper" purpose would not only contradict the plain language of the rule, undercut a central thrust of the grievance procedures, and involve the courts in a quagmire impossible to administer, but it would turn the grievance procedure on its head.
SUMMARY AND CONCLUSION
For the above reasons, respondents' amended motion to dismiss is denied in part. A hearing shall be scheduled immediately as to the remaining issue pertaining to the numerical composition of the reviewing committee as set out above. Counsel are ordered to contact the Court jointly in writing, after they have consulted, by no later than September 26, 1997, to indicate their availability for a hearing on either October 24 or October 31, 1997.
Douglas S. Lavine Judge, Superior Court CT Page 9006