******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., concurring. I generally agree with the majority's analysis, and I concur in the result that the majority reaches. I write separately, however, because I believe that the framework for analyzing state constitutional claims announced in *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), requires modification. In my view, when interpreting our state constitution, we generally should examine only the text of the constitution, the historical circumstances surrounding its adoption, and Connecticut case law to the extent that each is applicable. The other factors of consideration announced in *Geisler*, namely, federal case law, sister state case law, and sociological and economic considerations, do not shed any light on the meaning of our constitution except in certain, rare instances. Although I recognize that this court has analyzed state constitutional claims under *Geisler* for years, I believe that *Geisler* was overly expansive insofar as it listed factors of consideration that are wholly unrelated to our state's constitutional history and traditions. Accordingly, I respectfully concur.

In determining the appropriate method of constitutional interpretation, we must recognize that our constitution begins with a declaration that it comprises a "social compact" among the people of Connecticut. Conn. Const., art. I, § 1. This notion of a social compact has a long-standing history both in our jurisprudence; see *Opinion of the Judges of the Supreme Court*, 30 Conn. 591, 593 (1862) ("[t]he constitution of the state . . . embodies [the] *supreme original will* [of the people], in respect to the organization and perpetuation of a state government" [emphasis in original]); and the concept of constitutional government generally. See, e.g., J. Locke, Two Treatises of Government (1821) § 171, p. 338 ("[political] power . . . has its origin only from compact and agreement, and the mutual consent of those who make up the community" [emphasis omitted]); T. Paine, Rights of Man: Being an Answer to Mr. Burke's Attack on the French Revolution (2d Ed. 1791) p. 36 ("[t]he constitution of a country is not the act of its government, but of the people constituting a government"); see also G. Tarr, Understanding State Constitutions (1998) p. 200 ("in interpreting a state constitution, a state court is interpreting a unique collection of provisions with a distinctive generating history"); cf. *Calder* v. *Bull*, 3 U.S. (3 Dall.) 386, 388, 1 L. Ed. 648 (1798) ("The people of the United States erected their [c]onstitutions, or forms of government, to establish justice, to promote the general welfare, to secure the blessings of liberty; and to protect their persons and property from violence. The purposes for which men enter into society will determine the nature and terms of the social com-

pact . . . ." [Emphasis omitted.]).

With the understanding that our state constitution is a social compact between the citizens of Connecticut, it becomes clear that we must interpret the state constitution by focusing on considerations and concerns of those who came together to form the social compact. Our charge as a court is to determine what powers those who entered into the compact wished to delegate to their government and what rights and privileges they wished to reserve for themselves. Cf. *Bridgeport Public Library & Reading Room* v. *Burroughs Home*, 85 Conn. 309, 319, 82 A. 582 (1912) ("our [c]onstitution is to be construed as a grant and not as a limitation of power"). Accordingly, when interpreting the state constitution, our principal focus should be on ascertaining the intent of the framers as reflected in the text of the constitution, any instructive history, and Connecticut precedent. Conversely, we rarely should consider the three *Geisler* factors that are unrelated to our constitution, namely, sister state case law, federal case law, and sociological and economic concerns, because they generally cannot shed light on the social compact formed by the people of Connecticut. To further explain why consideration of these factors is inappropriate, I now address each in turn.

With respect to sister state case law, I fail to see why we should consider *other* courts' interpretations of *other* state constitutions to interpret our constitution in the absence of a specific connection to our constitution and its history. For instance, interpretations of constitutions such as Wyoming's, which was adopted in 1890; *Stogner* v. *State*, 792 P.2d 1358, 1360 (Wyo. 1990); rarely will be helpful in interpreting a provision originally adopted in our 1818 constitution. On the other hand, interpretations of the Mississippi constitution may be helpful because "[t]he declaration of rights adopted in 1818 appears to have its antecedents in the Mississippi constitution of 1817 . . . ." (Internal quotation marks omitted.) *State* v. *Williams*, 311 Conn. 626, 634, 88 A.3d 534 (2014). Likewise, interpretations of other states' constitutions may be of some small weight in our interpretation of a constitutional provision added at our 1965 constitutional convention if there is evidence that the delegates and voters considered a coterminous provision of another state's constitution in adopting the Connecticut provision. Additionally, the legislative history of amendments not adopted at a convention, which may refer to decisional law of another state, may be helpful in determining their meaning and scope. We should not, however, indiscriminately consider sister state case law because our object is to interpret Connecticut's constitution, not to conform it to some national consensus.

With respect to federal case law, the same principles apply. Because the federal constitution was drafted

prior to Connecticut's first constitution, federal precedent interpreting the federal constitution may be helpful in interpreting our constitution if there is historical or textual evidence that a certain provision of our constitution was patterned after a provision in the federal constitution. See, e.g., *State* v. *Davis*, 283 Conn. 280, 306–307, 929 A.2d 278 (2007) ("[T]his court repeatedly has observed that the language of article first, § 7, of the state constitution closely resembles the language of the fourth amendment to the federal constitution. . . . That linguistic similarity undermines the defendant's contention that the state constitution provides a greater opportunity to challenge the legality of a search than the federal constitution. The similarity denotes 'a common source and, thus, [supports] a common interpretation of the provisions.' " [Citations omitted; footnote omitted.]). The fact that the framers of our first constitution did not adopt the federal constitution wholesale but, instead, drafted a unique text suggests that the differences between our constitution and the federal constitution were intentional and should be given their due weight. Thus, I believe that interpretations of the federal constitution may be instructive only insofar as there is a specific connection between the federal constitution and our state constitution.

With respect to the final *Geisler* factor, sociological and economic concerns, this factor apparently was intended to allow this court to independently review the economic and sociological impact of a given statute or program. See *State* v. *Geisler*, supra, 222 Conn. 685, citing *State* v. *Jewett*, 146 Vt. 221, 500 A.2d 233 (1985). At the very least, that is how we have analyzed this factor in applying *Geisler*. See, e.g., *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 310–14, 990 A.2d 206 (2010) (interpreting article eighth, § 1, of state constitution by considering statistics regarding economic and sociological impact of secondary and higher education).

I do not believe that such considerations ever can be an appropriate tool of constitutional analysis, aside from historical considerations of public policies considered by the framers of our constitution. To suggest that we should interpret the state constitution according to our own assessment of the public policy implications of a statute or program is antithetical to our role as a judicial body. Indeed, prior to *Geisler*, we stated that "the primary responsibility for formulating public policy must remain with the legislature." *State* v. *Whiteman*, 204 Conn. 98, 103, 526 A.2d 869 (1987); see also *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 65, 469 A.2d 1201 (1984) ("It is not the role of this court to strike precise balances among the fluctuating interests of competing private groups which then become rigidified in the granite of constitutional adjudication. That function has traditionally been performed by the legislature, which has far greater competence and flexibility to deal

with the myriad complications which may arise from the exercise of constitutional rights by some in diminution of those of others."). Thus, we come dangerously close to usurping the role of the legislature when we independently analyze the public policy implications of a statute to determine its constitutionality. Accordingly, public policy considerations should play no role in our interpretation of the state constitution.[1]

In the present case, the majority considers all six *Geisler* factors in its analysis and concludes that each supports the position of the plaintiff, Jacob Doe, except for the text of the state constitution, which the majority concludes is neutral. As previously discussed, I believe that it is unnecessary to consider the three *Geisler* factors that are unrelated to Connecticut in interpreting the Connecticut constitution. I agree, however, that Connecticut's case law and constitutional history support the plaintiff's interpretation. I also agree that the text of the state constitution supports neither party but for a different reason than the majority's.

The majority concludes that the text of our constitution supports neither party because the language in article first, §§ 8 and 10, of the state constitution is "at best ambiguous with respect to the constitutional issue presented in this appeal." In my view, the focus of our textual analysis should be on the constitutional language that specifically pertains to the claim of the defendant, Hartford Roman Catholic Diocesan Corporation, namely, the term "property." The basis of the defendant's claim is that it has a vested right to a legal defense under a lapsed statute of limitations that amounts to a property interest. There is no question that the constitution protects individuals from governmental interference with their property interests, as article first, § 8, provides in relevant part that "[n]o person shall be . . . deprived of life, liberty or *property* without due process of law . . . ." (Emphasis added.) Thus, there is some basis for the defendant's claim in the text of the constitution insofar as it generally protects private property.

This language, however, is not determinative. "Because the [c]onstitution protects rather than creates property interests, the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law." (Internal quotation marks omitted.) *A. Gallo & Co.* v. *Commissioner of Environmental Protection*, 309 Conn. 810, 824, 73 A.3d 693 (2013), cert. denied sub nom. *A. Gallo & Co.* v. *Esty*,     U.S.    , 134 S. Ct. 1540, 188 L. Ed. 2d 581 (2014); see also *Giaimo* v. *New Haven*, 257 Conn. 481, 499, 778 A.2d 33 (2001) ("Property interests . . . are not created by the [c]onstitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."

[Internal quotation marks omitted.]). Accordingly, we must refer to sources beyond the text of the constitution to determine whether a statute of limitations defense can, as the defendant claims, constitute a vested property interest.

Specifically, we must turn to the historical circumstances surrounding the adoption of our constitution because, "[i]f the words [of the state constitution] have a doubtful meaning, or are susceptible of two meanings, they should receive that which will effectuate the intent of the framers of the [c]onstitution and the general intent of the instrument." (Internal quotation marks omitted.) *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 62, quoting *Borino* v. *Lounsbury*, 86 Conn. 622, 625, 86 A. 597 (1913). As previously stated, I agree with the majority that our constitutional history provides no support for the defendant's claim, as the legislature passed a resolution prior to 1818 that allowed a couple to appeal from an adverse ruling of the Probate Court even though the applicable limitation period for appeals had lapsed, thereby divesting certain individuals of a legal defense under a lapsed statute of limitations. See *Calder* v. *Bull*, supra, 3 U.S. (3 Dall.) 386–87 (discussing 1795 resolution). On the basis of this state history alone, I would determine that a lapsed statute of limitations does not give rise to a protected property interest and that there is no need to resort to federal case law, sister state case law, or sociological and economic considerations. Thus, I agree with the majority that our state constitution affords no greater protection to the defendant than does the federal constitution.

For the foregoing reasons, I concur.

[1] I note, however, that the majority's analysis of this *Geisler* factor in the present case is internally inconsistent. Specifically, the majority purports to undertake an independent review of the sociological and economic considerations at stake, in accordance with *Geisler*, but then fails to do so. The crux of the problem is the majority's assertion that, when considering this factor, "we must defer to the legislature's 'primary responsibility' in pronouncing the public policy of our state." Text accompanying footnote 62 of the majority opinion. This is inconsistent with how we previously have applied *Geisler*.

In reviewing constitutional claims, we certainly defer to the legislature insofar as "a validly enacted statute carries with it a strong presumption of constitutionality, [and] . . . those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt." (Internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 155, 957 A.2d 407 (2008). We also defer to the legislature, of course, whenever our state constitution specifically delegates a matter of public policy to the legislature, such as the implementation of free elementary and secondary education; see Conn. Const., art. VIII, § 1; or the establishment of lower courts. See Conn. Const., art. V, § 1.

When interpreting the state constitution, however, we owe no such deference to the legislature. See *State* v. *McCahill*, 261 Conn. 492, 504, 811 A.2d 667 (2002) ("[this court] . . . serve[s] as the body through which our state laws will be measured against the Connecticut constitution"), citing *Pratt* v. *Allen*, 13 Conn. 119, 132 (1839). If we were to defer to the legislature when considering the sociological and economic implications of a statute under *Geisler*, as the majority suggests we must, then that factor always would support the constitutionality of a statute. Thus, I disagree with the majority's suggestion that, "because of the actions of our legislature," public policy considerations under *Geisler* necessarily support a determination that General Statutes § 52-577d is constitutional.